Between JASON ROGERS and JACOB S. ROGERS, complainants, and CHARLES DANFORTH and others, defendants.

1. Where the complainants ask for an injunction to protect them *from apprehended danger*, and the answer denies that such apprehensions are well founded, the court, as a general rule, will give to the defendants the full benefit of such denial, and refuse the injunction ; and when both parties come before the court with affidavits, the court will refuse the injunction, unless the complainants make out a very clear case by their bill and affidavits.

2. It would seem that a tenant may ask the aid of this court to prevent his landlord from breaking a covenant which, though not made with the tenant, will work a forfeiture of his estate.

3. It does not follow that, because a suit at law cannot be maintained on such a covenant, a Court of Chancery may not protect the rights of parties under it.

4. It is no breach of a covenant which prohibits the erection of a forge or furnace *for the manufacturing of iron*, or the erection of any building for any such purpose, to erect buildings in which forges for the purpose of *heating iron* and *moulding* and *working* it into different kinds of articles to be used in the construction of locomotive engines are intended to be used.

5. *A forge or furnace for the manufacture of iron* has a definition comprehended and understood alike by scientific men and mechanics acquainted with the business ; and, in such cases, the definition will control in the construction of the covenant.

This was an application for an injunction, and was argued at February Term, 1853, on bill, and the affidavits filed on behalf of the defendant. The state of the case sufficiently appears in the opinion of the Chancellor.

*A. B. Woodruff* and *A. Whitehead*, for the complainants, cited *Eden on Inj.* 238, ch. 9 ; 2 *Story's Eq. J.*, § 959, *b*, *note* 1 ; *Broom's Maxims* 266, 276, 300.

*A. Pennington* and *A. O. Zabriskie*, for defendants, cited *Drewry on Inj.* 248 ; 2 *Eden* 269.

THE CHANCELLOR. In filing this bill, an application was

made for an injunction. An order was made for the defendants to show cause, on a day named, why an injunction should not issue in pursuance of the prayer of the bill. The defendants put in several affidavits, which were read without objection, and the motion was argued by counsel on both sides on the bill and the affidavits filed on behalf of the defendants.

" The Society for Establishing Useful Manufactures," at Paterson, in 1827, leased for twenty-one years, with a covenant for renewals, to James Shephard, a lot of land with a specified quantity of water for manufacturing purposes.

Charles Oliver became the owner of the interest of the society in this lease, and of their reversionary interest in the demised premises.

In 1848 Oliver renewed the lease to Shephard for twenty-one years.

Among various covenants contained in the lease was one that the lessee, his executors, administrators, or assigns should not use, or suffer, or permit to be used or employed the said demised premises, or any part thereof, nor the water-rights and privileges thereby given, or any part of them, at any time during the continuance of the lease, for the purpose of carrying on any manufacture of gunpowder, vitriol, spirits of turpentine, paints, varnish, tanning of leather, or as a pottery, or distillery of any kind, *or as a forge, or furnace, for the manufacturing of iron* or copper, or for the erection of any buildings for any such purpose.

In 1848 Oliver renewed the lease to Shephard for twenty-one years, containing a like covenant with the one before referred to.

In 1831 Shephard leased a part of the demised premises to Peter Walker. This lease contained covenants on the part of the lessee similar to those 'from Shephard to Oliver. The right of renewal was also secured.

By diverse mesne assignments, the complainants became the assignees of Walker's interest in the lease, in 1849.

The complainants being thus entitled to the renewal, in 1849, an indenture between Shephard and the complainants

was executed for the purpose. This last indenture does not contain the covenant before recited.

In 1852, Shephard sold and assigned all his interest in the demised premises to Danforth and Edwards, two of the defendants. In the indenture of sale to them, Danforth and Edwards covenant with Shephard to keep and perform all the covenants on the part of Shephard to be kept and performed in and by his lease from Oliver.

Thus it appears that of the demised premises originally leased by the society to Shephard, the complainants, by subleases and renewals, are in the enjoyment and possession of a part of the same, and that Danforth and Edwards are in the enjoyment and possession of the residue.

By these several assignments and renewals, Danforth and Edwards, the defendants, have become the immediate landlords of the complainants, while the defendants, as well as the complainants, hold under the original lease from the society to Shephard.

There is erected on the complainants' lot and occupied by them, an extensive and valuable cotton mill, which has been in operation for a number of years.

The bill alleges that Danforth and Edwards, with the other defendants named, who are their partners, are erecting on their lot extensive buildings for the purpose of carrying on therein a large factory for the manufacture of locomotive engines and other kinds of machinery, in which iron is the principal ingredient, and in which manufacture the working and manufacture of iron, by means of forges or furnaces, constitutes a principal and much the largest branch ; that the said building will be within a few feet of the complainants' cotton mill, and the forges and furnaces put therein and used will be dangerous to the cotton mill, subjecting it to imminent risk of fire from the sparks and cinders escaping from the forges and furnaces ; and that the smoke and cinders will greatly annoy the workmen in the cotton mill, and that such manufacturing establishments as the defendants contemplate erecting and carrying on will be a nuisance.

The complainants ask for an injunction.

First. On the ground that the defendants' contemplated erections will endanger the safety of the cotton mill, and will annoy the complainants' workmen therein, and that upon the principles on which the jurisdiction of this court is exercised to prevent private nuisances, the complainants are entitled to the protection of the court.

Admitting that, if the allegations of the bill are true respecting the effect of the defendants' erections, a case is made that will entitle the complainants to an interference of this court on their behalf, by injunction, yet this part of the case is fully met by the answer of the defendants and the affidavits accompanying it.

Whether or not the apprehensions of the complainants are well founded as to the danger and annoyance against which they seek protection, must depend, in a great measure, upon the manner in which the defendants' buildings are erected and the work carried on.

The defendants say, in their answer, that the building which they intend to use as a blacksmith-shop, and in which they expect to have all their fires, is about twenty-eight feet distant from the complainants' mill, and that it is the intention of the defendants to erect the standing places for their fires in such a way as to lead under ground by flues from each fire to one large chimney, which is to be eighty feet high from the surface of the ground, and that they intend to use mineral coal for these fires; that this chimney will be at least seventy-five feet distant from the cotton mill, and that the defendants do not intend to have any chimney except this large one; and they believe, with these constructions and protections, the complainants' mill will be in no danger from fire, nor will their workmen be annoyed by any cinders or sparks.

John Colt, in his affidavit, says that he has seen a large blacksmith-shop, with a great many fires, erected with a large chimney, and each fire communicating under ground with the chimney; that the shop was entirely free from smoke, and that there was not the least danger or inconvenience to anybody from it; and that he is satisfied such

Rogers et al. v. Danforth et al.

an erection would be free from every objection, and that at a distance of fifty feet from a mill, it would not be more dangerous than a dwelling-house there erected, and that with the use of mineral coal no sparks would ever be seen coming out of the chimney.

William Swineburn corroborates Mr. Colt's statements, and forms his opinion from having seen such works in actual operation.

He says they are no inconvenience to any one when erected in this way; and that a large blacksmith shop so erected, with a great many fires, when the chimney is from sixty to eighty feet high, is as free from danger to the surrounding buildings, and from smoke, sparks or cinders as a chimney to an ordinary house is to those living on the opposite side of the street. Mr. Swineburn is a manufacturer who has been connected with manufacturing establishments similar to those contemplated by the defendants; and from the experience he has had, and from his opportunities of judging, his opinion is entitled to great consideration.

The defence thus made on the part of the defendants is, I think, sufficient to overcome the mere apprehensions of the complainants, which is all they present for the court to act upon.

Where the complainants ask for an injunction to protect them from *apprehended* danger, and the answer denies that such apprehensions are well founded, the court, as a general rule, will give to the defendants the full benefit of such denial, and refuse the injunction; and where both parties come before the court with affidavits, the court will refuse the injunction, unless the complainants make out a very clear case by their bill and affidavits.

But there is another ground on which the complainants insist they are entitled to the injunction.

In the lease from Oliver to Shephard there is a covenant, which I have before mentioned, by which the lessee is restricted from the use of any of the demised premises *for the purpose of a forge or furnace for the manufacturing of iron*

*or copper, or for the erection of any building for any such purpose.*

The complainants insist that they are entitled to protection under this covenant, and that it prohibits the erection of any such buildings or machinery as are contemplated by the defendants.

The titles of both complainants and defendants are held under Charles Oliver, and are subject to the covenants in the lease from Oliver to Shephard. By this lease the lessee's estate is forfeited by a breach of the covenant by him or his lessees. By the several assignments before referred to, the defendants have become the landlord of the complainants. The latter have, therefore, a right to look to the former for protection. If the defendants violate this covenant, the estate of the complainants, their tenants, is forfeited. The tenant is asking the aid of the court to prevent his landlord from breaking a covenant, which, though not made with the tenant, will work a forfeiture of his estate.

It was rather conceded on the argument, that the complainants are without remedy at law against the defendants on this covenant; and for that reason it was insisted the complainants have stronger grounds for invoking the aid of a court of equity. Whereas, on behalf of the defendants, counsel urged that if the defendants have no rights at law under the covenant they can have no protection in equity.

It is clear that the complainants cannot maintain an action at law on this covenant in their own name. But may they not maintain an action in the name of the covenantee, and be protected by a court of equity in the use of his name, if necessary? But whether this be so or not, I do not think it follows that because a suit at law cannot be maintained on the covenant, a Court of Chancery may not protect the rights of parties under it.

In the case of *Barrow* v. *Richard and others*, 8 *Paige Ch. Rep.* 351, one Mercein owned a block of land in the city of New York. He divided it into lots and sold them to different individuals. The grantees covenanted, respectively, against the erection of a certain description of buildings.

On a bill filed by one of the grantees against another, it was held, that the covenants in the deeds of the different lots were for the mutual benefit and protection of all the purchasers of lots on the block; and although a previous purchaser from the owner of the block could not sue at law, upon the covenant in the deed to a subsequent purchaser, the Court of Chancery might protect him, by injunction, against the erection of. buildings prohibited by the covenant. This would seem to conflict with the decision in the case of *The Duke of Bedford* v. *Trustees of the British Museum*, 2 *Sugden on Vendors, App.* 361, where, in a case involving the same principle, the Vice-Chancellor sent the case to a court of law. Lord Eldon decided the party had no relief. The reasons for his conclusions are not given.

But admitting that the complainants are entitled to the benefit of the covenant, it cannot avail them, unless it be made to appear that the buildings and machinery the defendants propose erecting, are of a character prohibited by the covenant.

The covenant is, that the lessees should not use on the demised premises, or suffer a forge or furnace for the manufacturing of iron.

The defendants admit that they intend to use, in their buildings, forges for the purpose of heating iron, and moulding and working it into different kinds of articles to be used in the construction of locomotive engines. They deny that such forges are forges for the *manufacturing* of iron, as contemplated by the parties to the covenant.

On behalf of the complainants, it is argued that the evil to be guarded against was the working of iron in fires, and to prevent filthy trades in the neighborhood of cotton mills.

These lots were laid out, originally, for manufacturing purposes; a canal is cut, bounding them on one side, and intended to supply water to drive machinery. It was not intended to restrict the use of the lots to the erection of cotton mills. To have restrained the lessees from the use of fires, to mould and work iron for mechanical objects, would have been putting a restraint upon the purposes to which

the property was eminently adapted, and the tendency of which would be, necessarily, to diminish the value of the property.

If the restraint was against the lessees erecting a *forge* or *furnace,* the complainants' construction of the covenant would, I think, be the right one. But the covenant does not prohibit the erection of a forge or furnace, but of a forge or furnace *for the manufacturing of iron* or copper, *or the erection of any building for any such purpose.*

What is the definition of *a forge or furnace for the manufacturing of iron?* For, if there is a definition comprehended and understood alike by scientific men and by mechanics acquainted with the business referred to, such definition ought to control the court in its construction of this covenant.

What is such a forge or furnace? An establishment, or mechanical contrivance by which iron is made or manufactured from the ore. A forge manufactures or makes *malleable* iron direct from the ore. A blast furnace makes *cast* iron direct from the ore.

From what is iron manufactured? It is manufactured from the ore. By a blacksmith's forge iron is not manufactured. But, by it, from iron itself, machines or instruments of use are manufactured.

It is not the intention of the defendants to erect any forge or furnace for the manufacture of iron. Their object and intention is not to make iron, but to use iron when made, to be worked up into different materials.

I do not think that the erection of the buildings and apparatus designed by the defendants, will be a breach of the covenant in question.

The motion for an injunction is denied, with costs.

CITED *in Brewer* v. *Marshall,* 4 *C. E. Gr.*